[Cite as *State v. Schorr*, 2014-Ohio-2992.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | |
| | : | Hon. Sheila G. Farmer, P.J. |
| Plaintiff-Appellee | : | Hon. John W. Wise, J. |
| | : | Hon. Patricia A. Delaney, J. |
| -vs- | : | |
| | : | Case No. 13-CA-45 |
| | : | |
| JON E. SCHORR | : | |
| | : | |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDING:     Appeal from the Fairfield County Court
of Common Pleas Case No. 2012 CR
489


JUDGMENT:                    AFFIRMED


DATE OF JUDGMENT ENTRY:      July 2, 2014


APPEARANCES:

For Plaintiff-Appellee:                For Defendant-Appellant:

GREGG MARX                             THOMAS R. ELWING
FAIRFIELD CO. PROSECUTOR               60 West Columbus Street
239 W. Main, Ste. 101                  Pickerington, OH 43147
Lancaster, OH 43130

*Delaney, J.*

{¶1} Appellant Jon E. Schorr appeals from the April 4 and May 9, 2013 judgment entries of the Fairfield County Court of Common Pleas overruling his motion to suppress, accepting his plea of no contest, and sentencing him to a prison term of three years upon his conviction of two criminal offenses. Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶2} This case arose in the evening hours of October 16, 2012 when an anonymous caller contacted the Fairfield County Sheriff's Office and advised that three men, including "Jon," Daniel Cosner, and Jeffrey Eckert, were at a house on Lake Road cooking methamphetamine and one of those men was waving a gun. Dispatch forwarded the call to Sgt. Lee Hawks, who determined "Jon" was appellant. Hawks described specifics of appellant's house to the caller and the caller confirmed it was the house he was talking about. The caller refused to leave his name but his demeanor was "very excited" and he described an "ongoing current situation."

{¶3} Hawks summoned additional deputies to accompany him to appellant's house: Deputies Graham, Boring, and Walker.

{¶4} Hawks has investigated over 300 methamphetamine labs and is familiar with the processes used to make methamphetamine. He is able to identify the chemicals used in the manufacturing process. Hawks testified the "meth labs" he usually encounters contain remnants of the manufacturing process and are no longer functional. Even then, the chemicals create a hazard due to the risk of explosion. The approach to investigating and dismantling a meth lab requires specialized training and equipment. Law enforcement must evacuate and ventilate the area, determine the

materials used, obtain the appropriate protective gear, and neutralize the hazardous components. Hawks explained the biggest immediate risk upon discovery of a lab is explosion and fire from chemical reactions; the inhalation hazard is also high and the chemicals can burn the eyes, nose, and throat.

{¶5} Hawks and the other deputies responded to appellant's address, 1540 Lake Road, Lancaster, to investigate. Hawks considered this a weapons-related call and therefore the officers parked their cruisers on Lake Road south of appellant's driveway, blocked by trees, and blacked out their lights. Hawks directed each deputy to a position: Walker went to the rear northwest corner of the house, Boring and Graham went to the front door, and Hawks proceeded up the driveway.

{¶6} Appellee's exhibit 1-B depicts an aerial view of appellant's house. The driveway is perpendicular to Lake Road. Hawks marked the exhibit with the position of the cruisers obscured trees. Appellant's house shares the driveway with an aunt's house situated further from Lake Road.

{¶7} As Hawks entered the driveway, he immediately smelled the strong odor of a solvent which he suspected to be ether, a common ingredient in methamphetamine. (T. 34-37). Deputies Graham and Boring also described smelling a strong odor which Boring referred to as the "stink" of a meth lab. As Hawks proceeded up the driveway, the odor increased. Hawks heard people talking and saw light coming from the "bottom" of the house, consisting of a carport underneath the house covered by tarps hanging from a patio above. Through an 8- to 10-inch gap between the tarps, Hawks observed appellant and Daniel Cosner seated at a white plastic picnic table with various jars of liquids, including a red bottle of acid with a white lid and a Gatorade

bottle with a tube extended from it. The solvent odor was intense. Hawks described these as indicators of illicit use; it is typical in a meth lab to find a vessel with a tube coming out of it, which is a means of extracting "meth oil" and turning it into the "salt" or powdered compound.

{¶8}   Hawks did not enter the carport area under the tarps due to the presence of flammable vapor. He told appellant and Cosner to come out of the carport and detained them.

{¶9}   In the meantime, Deputies Boring and Graham were at the front door of the house. Upon approach, they believed they were looking for a possible third person with a firearm. Once at the door, Hawks advised he found a meth lab underneath the house; their goal therefore became to evacuate everyone from the house. Tiffany Crosby, appellant's girlfriend, answered the door and told deputies no one else was inside the house other than three children. Crosby and the children were brought outside and taken to an aunt's house nearby.

{¶10} Crosby stated she knew appellant was downstairs with someone but she didn't know what they were doing. She later signed a consent-to-search form. At the suppression hearing she testified she gave consent because she was threatened with arrest. Upon rebuttal Hawks denied any coercion.

{¶11} Deputies then performed a protective sweep of the upstairs of the house, looking for anyone still inside the house. The sweep entailed looking into spaces where a person might hide. No one was found. No protective sweep was immediately performed in the basement, crawlspace, and carport area under the house due to

hazards of the meth lab. After appropriate protective gear was brought to the scene, Hawks completed a protective sweep of those lower portions of the house.

{¶12} Hawks concluded he was looking at a functional methamphetamine lab in the process of a cook on the table. Walker came to assist him in detaining appellant and Cosner, who were placed in separate cruisers.

{¶13} Hawks did not re-enter the meth lab area in the carport until "County HazMat" arrived with appropriate protective gear including a self-contained breathing apparatus and a safety line.

{¶14} Appellant showed deputies burns on his arms which he said were from an explosion several days ago. The burns required treatment upon his evaluation by medics so he was transported to the hospital.

{¶15} The third person described by the caller, Jeffrey Eckert, was not found at the scene. He drove by the house in a car several times and was eventually stopped and identified, but not arrested. No firearms were found.

{¶16} Appellant was charged by indictment with one count of illegal manufacture of drugs, a first-degree felony [R.C. 2925.04(A) and 2925.04(C)(3)(b)], and one count of illegal assembly or possession of chemicals for the manufacture of drugs, a felony of the second degree [R.C. 2925.041(A) and (C)(2)]. Appellant filed a motion to suppress evidence obtained as a result of deputies' entrance upon his property and appellee responded with a memorandum contra.

{¶17} The suppression hearing was held on February 8 and March 1, 2013. Both parties filed post-hearing memoranda. On April 4, 2013, the trial court journalized its Entry Overruling Defendant's Motion to Suppress. Appellant thereupon entered

pleas of no contest to Counts I and II on April 30, 2014. The trial court found Counts I and II merged for purposes of sentencing and appellee elected to sentence on Count I, illegal manufacture of drugs. Appellant was sentenced to a prison term of three years and his operator's license was suspended for six months. Appellant was also advised of a five-year period of post-release control.

{¶18} Appellant now appeals from the trial court's Entry Overruling Defendant's Motion to Suppress of April 4, 2013 and the Judgment Entry of Sentence of May 9, 2013. Appellant raises one assignment of error:

## ASSIGNMENT OF ERROR

{¶19} "THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED FROM AN UNREASONABLE SEARCH AND SEIZURE IN VIOLATION OF APPELLANT'S RIGHTS GUARANTEED BY THE FOURTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SECTION 14, ARTICLE I OF THE OHIO CONSTITUTION."

## ANALYSIS

{¶20} Appellant argues the trial court should have granted his motion to suppress because law enforcement's entry onto his property and subsequent actions constituted an unreasonable search and seizure violating the Fourth Amendment. We disagree.

{¶21} Appellate review of a trial court's decision to deny a motion to suppress involves a mixed question of law and fact. *State v. Long*, 127 Ohio App.3d 328, 332, 713 N.E.2d 1 (4th Dist.1998). During a suppression hearing, the trial court assumes the role of trier of fact and, as such, is in the best position to resolve questions of fact and to

evaluate witness credibility. *State v. Brooks*, 75 Ohio St.3d 148, 154, 661 N.E.2d 1030 (1996). A reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Medcalf*, 111 Ohio App.3d 142, 145, 675 N.E.2d 1268 (4th Dist.1996). Accepting these facts as true, the appellate court must independently determine as a matter of law, without deference to the trial court's conclusion, whether the trial court's decision meets the applicable legal standard. *State v. Williams*, 86 Ohio App.3d 37, 42, 619 N.E.2d 1141 (4th Dist.1993), overruled on other grounds.

{¶22} There are three methods of challenging a trial court's ruling on a motion to suppress on appeal. First, an appellant may challenge the trial court's finding of fact. In reviewing a challenge of this nature, an appellate court must determine whether the trial court's findings of fact are against the manifest weight of the evidence. See, *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982); *State v. Klein*, 73 Ohio App.3d 486, 597 N.E.2d 1141 (4th Dist.1991). Second, an appellant may argue the trial court failed to apply the appropriate test or correct law to the findings of fact. In that case, an appellate court can reverse the trial court for committing an error of law. See*, Williams*, supra. Finally, an appellant may argue the trial court has incorrectly decided the ultimate or final issues raised in a motion to suppress. When reviewing this type of claim, an appellate court must independently determine, without deference to the trial court's conclusion, whether the facts meet the appropriate legal standard in any given case. *State v. Curry*, 95 Ohio App.3d 93, 96,620 N.E.2d 906 (8th Dist.1994).

{¶23} Appellant argues deputies' initial approach to his house was unconstitutional trespass upon the curtilage of his property. We will separately examine the challenged actions.

{¶24} The Fourth Amendment to the United States Constitution prohibits warrantless searches and seizures, rendering them per se unreasonable unless an exception to the warrant requirement applies. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The government may not intrude into areas where legitimate expectations of privacy exist. In determining whether the Fourth Amendment protects against a search, "the rule that has emerged * * * is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.'" *Katz,* 389 U.S. at 361 (Harlan, J., concurring). See *Rakas v. Illinois*, 439 U.S. 128, 143–144, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978); *State v. Williams*, 73 Ohio St.3d 153, 166–167, 652 N.E.2d 721 (1995).

*Officers' First Steps upon Arrival at the Scene*

{¶25} The triggering event of Fourth Amendment analysis in this case is the officers' entry into the driveway of appellant's house where they smelled the strong odor of a solvent, or the "stink" of a meth lab.

{¶26} The actions of Hawks, Boring, and Graham, who entered only upon areas of appellant's property impliedly open to the public, were reasonable. We have previously found officers were permitted to enter upon the driveway of a house and walk up to the front door to speak to occupants about complaints that they were growing

marijuana in the garage. *State v. Cook*, 5th Dist. Muskingum Nos. 2010-CA-40, 2010-CA-41, 2011-Ohio-1776, ¶ 67.

{¶27} Search and seizure cases often turn upon their unique facts. Key factors in the instant case include the call regarding an "ongoing current situation" with a possible gun and a meth cook, corroborated by the odor encountered upon arrival, finally verified by Hawks' observation of appellant's actions in the carport. In *State v. Morgan*, 5th Dist. Fairfield No. 13-CA-30, 2014-Ohio-1900, we addressed a case in which law enforcement performed a "knock and talk" at a house, during which officers impermissibly entered into the curtilage of the property and from there were able to spot marijuana plants. This case is distinguishable from *Morgan* because here the officers were lawfully present in the areas in which they discovered the meth lab.

{¶28} Only one officer left the driveway, and appellant argues Deputy Walker impermissibly trespassed upon the curtilage of his property. "The curtilage is an area around a person's home upon which he or she may reasonably expect the sanctity and privacy of the home. For Fourth Amendment purposes, the curtilage is considered part of the home itself." *Oliver v. United States*, 466 U.S. 170, 180, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The only areas of the curtilage where officers may lawfully go are those impliedly open to the public, including walkways, driveways, or access routes to the house. *State v. Cook,* 5th Dist. Muskingum Nos. 2010-CA-40, 2010-CA-41, 2011-Ohio-1776, ¶ 65, citing *State v. Birdsall*, 6th Dist. Williams No. WM-09-016, 2010-Ohio-2382, ¶ 13.

{¶29} Because the curtilage of a property is considered to be part of a person's home, the right of the police to come into the curtilage is highly circumscribed. *State v.*

*Woljevach*, 160 Ohio App.3d 757, 2005-Ohio-2085, 828 N.E.2d 1015, at ¶ 29. Absent a warrant, police have no greater rights on another's property than any other visitor has. Id.

{¶30} We agree with the trial court's conclusion Walker did not enter the curtilage of appellant's home. "The extent of a home's curtilage is resolved by considering four main factors: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the use to which the area is put; and (4) the steps taken to protect the area from observation by passersby." *State v. Mechling*, 5th Dist. Ashland No. 12-COA-040, 2013-Ohio-3327, ¶ 13, citing *U.S. v. Dunn*, 480 U.S. 294, 301, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987).

{¶31} The evidence demonstrates Walker went to the "back [northwest] corner of the house" (T.32). Hawks marked Walker's position on State's Exhibit 1-B, demonstrating Walker was off the driveway in the yard to the rear of the house. We cite the trial court's apt description of Walker's position:

> * * *[D]eputy Walker was located about 20 feet from the northwest corner of the house. The aerial photograph shows that the area in which he stood was a large grassy area, with nothing but grass covering the ground to the west (~120 feet to Lake Road), the ground to the north (~120 feet to the nearest house), the ground to the south (~100 feet to the driveway) and the ground to the east (~180 feet to the nearest house). The photograph and Sgt. Hawks's testimony established that there was no fence surrounding

the house or area where Deputy Walker was located nor did any of the officers view any "No Trespassing" signs anywhere on the property. Further, the officers testified that at all times, all officers were in plain view from the driveway, Lake Road, and the neighboring houses. ***

{¶32} We agree with the trial court's conclusion Walker was not in the curtilage of appellant's property; although Walker's position was a relatively short distance from the house, it was not within an enclosure, was visible from the road and surrounding homes, and in an area not observably used for any other purpose.

{¶33} Once Hawks detained appellant and Cosner, Walker came to the carport area to assist him. We note Walker had no role whatsoever in the discovery of any evidence. The inevitable-discovery doctrine is inapplicable only because no evidence was recovered as a result of his position in the yard. Under the inevitable discovery rule, illegally obtained evidence is properly admitted in a court proceeding once it is established that the evidence would have been ultimately or inevitably discovered during the course of a lawful investigation. *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). In the instant case we do not find Walker's actions require application of the inevitable-discovery doctrine because we have found his actions neither violated the Fourth Amendment nor resulted in discovery of any evidence.

*Protective Sweep*

{¶34} We have found law enforcement was lawfully present when appellant was observed cooking methamphetamine. We next turn to appellant's contention the initial

entry into appellant's house to perform the protective sweep was unlawful. At the front door Boring made contact with Tiffany Crosby when she answered his knock. As they spoke, Boring was advised Hawks had two suspects detained from the carport area. Graham briefly assisted Hawks in handcuffing appellant and Cosner, and then returned to the house to advise they needed to clear the house for two reasons: the third person reported by the caller had not yet been found, and there was an active meth lab under the house. Boring and Graham then performed a protective sweep of the upper portion of the house, looking into any area where a person might be found and removing Crosby and her three children.

{¶35} The protective sweep of the house is lawful. In *Maryland v. Buie*, the United States Supreme Court approved the "protective sweep," holding officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched but "[b]eyond that, however * * * must have articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id. at 327.

{¶36} Articulable facts exist in this case warranting the deputies' belief a third person, possibly armed, might be present. A protective sweep of the house for the third person was reasonable.

{¶37} Moreover, by this point in events officers knew there was an active meth lab under the house. R.C. 2933.33(A) provides:

> If a law enforcement officer has probable cause to believe that particular premises are used for the illegal manufacture of methamphetamine, for the purpose of conducting a search of the premises without a warrant, the risk of explosion or fire from the illegal manufacture of methamphetamine causing injury to the public constitutes exigent circumstances and reasonable grounds to believe that there is an immediate need to protect the lives, or property, of the officer and other individuals in the vicinity of the illegal manufacture.

{¶38} The presence of the active meth lab constitutes exigent circumstances justifying the officers' first entry into the house.

*Consent to Search*

{¶39} Once the house was secured, protective gear was brought to the scene and hazardous chemical compounds were neutralized. Approximately two hours into this process, Tiffany Crosby signed a consent-to-search form. She testified officers told her she could go to jail that night; she told them she didn't know anything about the meth lab and "assumed" officers would search the house with or without her permission.

Appellant argues Crosby was therefore coerced into giving her consent to search. We disagree.

{¶40} A search conducted pursuant to consent is one exception to the search warrant requirement. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). When the state seeks to establish consent for a warrantless search, it is not limited to proving that the defendant himself consented, but it may also show that the consent was obtained from a third party who possessed common authority or other sufficient relationship over the premises to be inspected. *United States v. Matlock*, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); *Schneckloth v. Bustamonte,* supra. Law enforcement officers do not need a warrant, probable cause or even reasonable, articulable suspicion to conduct a search when consent for a search is voluntarily given. *State v. Riggings,* 1st Dist. Hamilton No. C-030626, 2004-Ohio-4247, ¶ 11, citing *Schneckloth*, supra, 412 U.S. at 219; *State v. Comen*, 50 Ohio St.3d 206, 211, 553 N.E.2d 640 (1990).

{¶41} The question whether consent * * * was in fact voluntary or was the product of duress or coercion, express or implied, is to be determined by the totality of all the circumstances, and is a matter which the government has the burden of proving by clear and convincing evidence. *State v. Bailey,* 4th Dist. Scioto No. 1725, 1989 WL 74861 (Jun. 27, 1989), citing *Schneckloth*, supra, 412 U.S. at 227; *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968); *State v. Posey*, 40 Ohio St.3d 420, 427, 534 N.E.2d 61 (1988); *Comen*, supra. "Clear and convincing evidence" is evidence that would produce in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established and requires a higher degree of proof than a

preponderance of the evidence, but less evidence than reasonable doubt. *State v. Wilson*, 113 Ohio St.3d 382, 386, 865 N.E.2d 1264 (2006).

{¶42} In *Bailey*, supra, the Fourth District cited *U.S. v. Phillips*, 664 F.2d 971 (1981), for criteria to consider in weighing voluntariness:

> Among the factors considered in evaluating whether a defendant's
> consent was in fact voluntary-none of which is a controlling factor-
> are voluntariness of the defendant's custodial status, the presence
> of coercive police procedure, the extent and level of the defendant's
> cooperation with police, the defendant's awareness of his right to
> refuse to consent to the search, the defendant's education and
> intelligence, and, significantly, the defendant's belief that no
> incriminating evidence will be found." Voluntariness cannot be
> established by a mere showing that the person simply acquiesced
> to a claim of lawful authority. [Citations omitted.]
>
> *State v. Bailey,* 4th Dist. Scioto No. 1725, 1989 WL 74861 (Jun. 27,
> 1989), *5.

{¶43} Crosby did not articulate threats conditioned upon her consent to search. She "assumed" the house would be searched with or without consent, which does not establish coercion. Appellee presented rebuttal evidence in the form of testimony by Hawks, who stated officers explained the dangers posed by the meth lab, read the consent-to-search form to her, and advised her she would be present during the search, all of which Crosby understood. As they walked toward the house Crosby asked whether she could go to jail and officers responded she could face criminal charges, an

accurate statement under the circumstances. Per Hawks, Crosby was cooperative during her entire contact with officers and was not threatened with arrest, nor was she arrested that night. She was present throughout the search of the house and was permitted to return to the aunt's house a short distance away after the search concluded.

{¶44} We find, considering the totality of the facts and circumstances, appellee established by clear and convincing evidence Tiffany Crosby voluntarily consented to the search of the house.

{¶45} We conclude, therefore, the entry upon appellant's driveway and subsequent events did not violate the Fourth Amendment. The trial court therefore properly overruled appellant's motion to suppress and appellant's sole assignment of error is overruled.

## CONCLUSION

{¶46} Appellant's sole assignment of error is overruled and the judgment of the Fairfield County Court of Common Pleas is affirmed.

By:  Delaney, J. and

Farmer, P.J.

Wise, J., concur.