[Cite as *State v. Diamond*, 2018-Ohio-3287.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 27904 |
| | : | |
| v. | : | Trial Court Case No. 2017-CRB-1128 |
| | : | |
| JEAN DIAMOND | : | (Criminal Appeal from |
| | : | Municipal Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 17th day of August, 2018.

. . . . . . . . . . .

J. JEFFREY HOLLAND, Atty. Reg. No. 0040089, 1343 Sharon-Copley Road, P.O. Box 345, Sharon Center, Ohio 44274
    Attorney for Plaintiff-Appellee

MARK J. BAMBERGER, Atty. Reg. No. 0082053, P.O. Box 189, Spring Valley, Ohio 45370
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** This matter is before the Court on the Notice of Appeal of Jean Diamond. Diamond appeals from her January 19, 2018 judgment entry of conviction in the Municipal Court of Miamisburg, following a bench trial, on three counts of neglect of companion animals, in violation of R.C. 959.131(D)(1), and one count of neglect of companion animals, in violation of R.C. 959.131(D)(2), all misdemeanors of the second degree. The court ordered that Diamond is "prohibited from owning or possessing any companion animals" at her home, and that she "is further placed under an indefinite prohibition from owning or possessing any companion animals, pursuant to O.R.C. § 959(E)(6)(b), at any residence where the Defendant may reside." The court ordered Diamond to complete a mental health assessment with Dr. Mary Melton of the Ohio Intervention Center and complete all recommended counseling/treatment. The court imposed two years of reporting probation, and it ordered the Probation Department to make monthly home visits in addition to random home visits "to confirm that she does not own or possess any companion animals." The court imposed fines and costs of $1,145.00, and restitution of $5,000.00, with a total balance due of $6,145.00. Since ineffective assistance of counsel is not demonstrated, we hereby affirm the decision of the trial court.

**{¶ 2}** Diamond was charged by way of complaints on June 26, 2017 (Case Number 17CRB01128A-D). On September 5, 2017, Diamond filed a plea of not guilty by reason of insanity. The court ordered a psychiatric evaluation the following day, the results of which are not part of our record.

**{¶ 3}** Diamond's trial occurred on January 11, 2018. At the start thereof, Tom Scott testified that he was a zoning inspector for Miami Township and he was familiar with

Diamond's residence, located on Washington Park Drive. Scott testified that, in May 2013, he responded to a complaint about the conditions of the property, including debris scattered around, an offensive odor, and several cats coming and going from the property. Scott stated that he found a large area that may have been a garden that "at one time had mulch to it and it had been overcome with * * * feces." Scott testified that he noticed an odor of urine from the street, and that he observed several cats, as well as cages and cat food. Scott stated that he left a business card after knocking on the door, but that Diamond did not contact him. He testified that he "issued a written violation from the office by certified and registered mail, neither returned."

{¶ 4} Scott testified that he returned to the property several times, most recently in May 2017 after receiving a complaint about a fence between Diamond's property and an adjoining one. He stated that, at the time, the strong odor consistent with cat urine and feces was still present, and that he observed cages, bowls, dishes, and empty bags of cat food. Scott testified that he did not speak to Diamond on that occasion. He identified Exhibit 20 as containing nine written notices sent to Diamond about the conditions at her property. Notices dated May 15, 2013, November 7, 2013, and March 10, 2015 provided in part: "Harboring, luring and continued feeding of stray animals (cats) must cease. The fecal and urine waste has created a health issue for the home and neighborhood."

{¶ 5} Jessica Johnson testified that she is Diamond's neighbor. She stated that Diamond has always had a lot of animals, and that when Diamond's husband moved out, "it seemed like she just didn't have enough hands to take care of it all." According to Johnson, Diamond "had a love for animals" but "just couldn't keep up with the cleanup." Johnson testified that Johnson's dog "would constantly roll in the cat feces that would be

in our back yard and * * * the cats would constantly come and * * * leave feces in our front flower bed and I had a really pretty front flower bed that I spent a lot of money on and the smell in the summer time was really, really bed." Johnson testified that the smell came from Diamond's home and not her flower bed, because she cleaned up her flower bed regularly. She testified that the smell was "definitely cat urine ammonia."

{¶ 6} Johnson testified that she expressed concern to Diamond, offered to help Diamond clean up, and "helped her clean her kitchen one time." When asked how many cats Diamond had, Johnson responded that she "couldn't count." Johnson stated that she offered to call "animal control, I told her that I would call the humane society, and any time you offered to help to get rid of the cats inside, she would become belligerent and say I don't need help with cats on the inside I need help with cats on the outside." According to Johnson, "the cats were coming from the outside into the inside through the garage, there was a hole through the garage up into the ceiling and they were going into the house and even we noticed that there was a rac[c]oon at one point going into her walls." Johnson testified that Diamond fed cats inside and outside her home.

{¶ 7} Johnson testified that she eventually "called the humane society a couple years ago," and that a humane officer responded and spoke to Diamond's daughter; "they were able to remove several cats with Miss Diamond's daughters' assistance and * * * when Miss Diamond got home she was not very happy." Johnson stated that she observed "several kittens and cats, they would keep having litters, but they were very thin, even though she would put food out * * * and you could tell they were mite eaten, * * * their fur was not very kept up, * * * you could tell they were flea bitten * * *." She testified that the kittens had thin and "very patchy fur." According to Johnson, "there were kittens

that were just roaming around and a lot of them * * * had red blood shot eyes."

{¶ 8} Johnson testified that one day when it was very hot, she observed a "tiny little kitten, black kitten that came directly from [Diamond's] house, along with the other litter of black kittens, and it fell down the sewage pipe, the sewage drain and it took almost an hour to crawl it's way back out." Johnson stated that a neighbor took the kitten to Diamond's house and left it on her doorstep after an exchange in which Diamond stated "they are not my cats." Johnson testified that when the kitten began to wander toward the sewage drain again, she "grabbed it and that's when I called the animal control again." According to Johnson, "the kitten had no eyes, it's eyes were just like blood * * *." Johnson identified a photograph of the kitten and stated that "my son was crying over it, yes." Johnson stated that Officer Heather Concannon responded to her call.

{¶ 9} When asked what she thought about Diamond denying that the cats were hers, Johnson responded that Diamond "did try to care for those animals, she would be out there on her hands and knees * * * on the ground outside the garage trying to take the fleas off the cats." Johnson testified that "that whole litter was flea bitten and sick, she would actually even be giving them antibiotics in their food * * *. And so she was working with that entire litter and that's how I know that was her cat." Johnson stated that there were "at least five" kittens in that litter in similar condition. She testified that "cats would just pour out, it was like a bad meme" and Diamond's "whole yard would be filled with cats and then they would spill out into the neighborhood. Her car * * * would be covered in cats."

{¶ 10} Margaret Stack, a licensed veterinarian with 24 years of experience, testified that she was employed by the Humane Society of Greater Dayton as a contract

veterinarian. Stack examined animals that were removed from Diamond's residence on June 4, 2017. She testified that humane agent Heather Concannon brought the cats to her. Stack testified that ammonia is a respiratory irritant that can cause suffering in animals. Stack stated that fecal and urine ammonia causes burning of mucous membranes, coughing, and burning of lung tissue in animals and humans. Stack identified State's Exhibits 1-8 as photos of the cats she examined. She was shown Exhibits 9 – 17, and the prosecutor represented to her that the photos reflected the conditions of Diamond's home when the cats were removed. Stack testified that the photos of the home would cause her concern for the cats' health because Diamond's home "appears to be filthy." Stack testified that such conditions can cause animals to suffer through disease, toxins, and bacterial problems. She stated that cats on ground level are closer "to the source of ammonia, fungal spores, bio-aerosols."

{¶ 11} Stack testified that "if people are entering the facility and are experiencing signs of ammonia toxicity, any one or any animal that lives there on a consistent basis is going to be exposed to it 24 hours a day," causing suffering. Stack stated that the kittens she examined from Diamond's home had "signs of upper respiratory tract disease." Stack identified State's Exhibit 21A as her June 23, 2017 summary statement she prepared after examining the cats, and State's Exhibit 21B as her August 5, 2017 summary statement. Stack stated that the statements are made to a reasonable degree of veterinarian certainty. Stack testified that the cats were suffering unnecessarily, and that their suffering could have been avoided if Diamond had not had so many cats and provided a clean home, "appropriate health care, appropriate food and water."

{¶ 12} In Exhibit 2, Stack identified a "very thin" gray kitten whose "eyes are teary,

there is nasal discharge."   In Exhibit 6, Stack identified another gray kitten with similar characteristics and she testified that "the conjunctiva to the eyes is swollen, you can't see * * * the entire eye, the globe part."   She stated that the cat depicted has "some discharge, overall unthrifty coat, not smooth, not something you would want to pet."   Stack testified that the poor conditions of the kittens should have been obvious to a reasonably conscientious pet owner, and the kittens should have been taken to a veterinarian.

{¶ 13}   On cross-examination, Stack testified that of the 27 cats removed from Diamond's home, two had died, and the remaining ones "have been placed in homes at this time."   She stated that the cats "have been spayed and neutered, they have been vaccinated, treated for parasites" in her care.   Stack testified that the problems with the cats' eyes result from feline herpes virus, which is spread from cat to cat.   She stated that the virus "can be chronic, it can be rapid, and once you have herpes, you always have herpes."

{¶ 14} On redirect examination, Stack testified that the surviving cats "did improve when given proper care" and eventually did not have clinical signs of suffering.   She testified that a cat with feline herpes "does not have to have clinical signs or be suffering from herpes all the time." Stack testified that one of the kittens she examined had a "ruptured globe" in its eye, as depicted in Exhibit 1.   She testified that she felt "certain it was herpes that caused the rupture in the eye."   According to Stack, "eyes are very important to animals' well-being and allowing that globe to become so diseased that [it] rupture is, it didn't happen that day."   Stack stated that a ruptured globe is painful.   She further testified that the cats "did have some open mouth breathing."   She stated that

cats normally breathe through their noses, and because "their nasal passages are so clogged with mucus and discharge from the respiratory infection * * * they have to open their mouths to breathe." She stated that it would take a substantial amount of time for the infection to reach that level.

{¶ 15} Heather Concannon testified that she is the humane agent for Montgomery County, and that in her role she investigates animal cruelty, abuse and neglect, having been trained to detect instances of such. She stated that she has been to Diamond's home many times. She stated that, in May 2016, Tom Scott contacted her about the welfare of Diamond's cats "in addition to the sanitary conditions that the resident was living in." Concannon testified that she "determined that the previous humane agent had also made multiple calls to that residence regarding the same." Concannon stated that she attempted to contact Diamond at her home after speaking to Scott, but "there was no answer at the door, no car in the driveway."

{¶ 16} Concannon testified she "left a notice advisory" on Diamond's door and requested that Diamond call her "regarding the conditions of her property and the cats." At the time, Concannon testified that she observed "what we would classify as a conditional hoarding situation, * * * multiple cats of different ages and various stages of neglectful health, in addition to the * * * overwhelming smell, the odor of ammonia, burning eyes, burning throat on approaching the residence." Concannon stated that she first noticed the odor from the road when she exited her vehicle, about 75 feet away from the home.

{¶ 17} Concannon stated that there "were cats in the residence, going in and out of the garage, which had * * * almost a foot * * * that was propped open at the bottom to

allow entrance and exit of cats, there were also cats going around the property in addition to sitting on the property, lying on the property, they were everywhere on the property." Concannon testified that the cats "were thin, their coats were very sparse, very patchy, * * * had watery eyes, some of them were matted shut, ocular, nasal discharge, one cat was panting that was lying in the window." The windows were propped open approximately 2 to 3 inches"; there were screens in the windows. According to Concannon, "the cats were actually congregated at the bottom of windows trying to breath[e] fresh air from outside, so all around the house, these cats are at the bottoms of these windows trying to breath[e]."

{¶ 18} Concannon testified that Diamond "did actually return one of my [calls]," and she acknowledged being the caretaker of the cats. Concannon testified that she "explained to [Diamond] that she needed to close * * * the garage door, * * * she needed to retract the attic stairs that were down in her garage because the cats were actually entering the residence also through the attic stairs and going into the attic, * * * and she stated that she was somewhat overwhelmed." Concannon testified that she "extended multiple times, multiple types of help," including "traps, spay, neuter, food if she needed, if there was any kind of help that we could offer in addition to other types of animal welfare groups, it had been offered in addition to previous." According to Concannon, Diamond "did just the opposite of what I suggested."

{¶ 19} When asked if Diamond was luring the cats into the garage, Concannon responded, "[a]bsolutely." Concannon stated that Diamond "had put large bags of food, there were actually chewy.com boxes * * * on her front porch, there were large bags of food inside of her garage that had just been opened and dumped out, and the cats were

freely coming and going." Concannon stated that Diamond had "cat food dumped in her garage on big huge Rubbermaid lids."

{¶ 20} Concannon testified that she stopped communicating with Diamond when Diamond "had her then attorney send me a letter to cease and desist." Concannon identified Exhibits 23 and 24 as "my advisory notices" that she placed on Diamond's front door. The first, dated July 5, 2016, advised Concannon that she was in violation of R.C. 959.13, and that there were "excessive/high levels of ammonia" at her premises. The advisory notice further provided: "Interior of residence must be cleared or cats WILL be removed and criminal charges. Several indoor cats are noted as having upper respiratory issues (discharge – ocular and nasal, likely caused by high ammonia levels. This is toxic to pets and humans." (Emphasis sic.) The second advisory, dated July 11, 2016, provided: "Cats are still accessing garage – cages have been moved; they are now accessing your attic! Cats observed in garage today – pls fix and live trap any caught inside!" Concannon identified Exhibit 22 as the July 28, 2016 cease and desist letter she received from Diamond's attorney.

{¶ 21} Concannon testified that her attention was next drawn to Diamond's property when Johnson called her about the kitten that fell into the drain in 2017. Concannon testified that she responded to Diamond's residence, "found a black kitten who could not see, had a limp, had an injured tail and then also found additional kittens in the same state with the upper respiratory infections." She stated that the kittens "were open mouth breathing," which is a sign of distress in cats. Concannon testified that she seized the kittens and took them to Med Vet because "Dr. Stack was not in that day" and "they needed emergency care due to the fact that they were open mouth breathing." She

stated that she subsequently took the kittens to Stack, and that she confirmed with the veterinarian that the animals were neglected.

{¶ 22} Concannon stated that she then "requested and applied for a warrant that was issued and I returned to the residence" on June 4, 2017. She stated that she entered the residence through an unlocked back door, and that the smell of ammonia was "overwhelming." Concannon stated that her eyes "burned, nose burned, started watering, throat burning." Concannon testified that photographs were taken in her presence, and that Exhibit 9 is a photo that accurately depicts an area in the home "entering into the kitchen area." Concannon is visible in the photograph, and she testified that her "boots were sticking to the floor, there is dirt, there is fecal matter, lord knows what." She stated that there "were bugs flying, there were gnats flying, there were bugs crawling down and around, cats hiding, things falling, sticking smelling." According to Concannon, on the linoleum floor there was "fecal matter, some of it was urine, there was a plate of food that there were roaches and all kinds of bugs crawling in."

{¶ 23} Concannon testified that Exhibit 10 depicted "the northwest bedroom and these are the cats, actually at the bottom of the window where the screen is, where they were trying to breath[e]." She stated that there was no way for the cats to escape the house, since "each one of the bedrooms were closed and individual cats were locked into individual bedrooms." She stated that Exhibit 11 depicted "the west facing side of the same room." She testified the room contained "sticky, old food, food on the floor, food on the table, you could see where the cats were jumping up on the table up into the window where they were just sitting looking out the window, they were trapped in there."

{¶ 24} Concannon testified that Exhibit 12 depicted the living room of the

residence, and she testified that it contained "a great big huge plastic bin that was being used as a litter box." She stated that "it was absolutely full of fecal matter and urine," and that "sometimes multiple cats won't use [a litter box] after another cat." She testified that instead, cats "will go outside of the litter box." Concannon identified the front door in the photo, noting that "you can't enter through the front door." She identified two pans on the floor containing food and water, an area where the "cats can jump up and sit in the front window," and another plate of cat food with "bugs crawling." Concannon further testified that the photo depicted urine where the cats "have sprayed," as well as a Chewy.com delivery box and "another one of the many litter boxes."

{¶ 25} Concannon testified that Exhibit 13 depicted the interior of the kitchen, reflecting "pans of food, more dirt, grime, fecal matter, there is actually a cat hiding underneath the sink, underneath the pipes." She testified that Exhibit 14 depicted the "center bathroom." Concannon testified that "cats were coming out through the attic in the garage and come across inside here and come down into the wall if you can see this * * * door is open on the vanity, they actually enter and exit through one of the holes that are in this vanity area here and there is a pan of water down there." She stated that "other cats can leave, enter and leave through this vanity, go up through the actual walls in-between the 2 X 4's, go up into the attic and through the attic * * * enter and exit through the pull down access." When asked if animals were being lured in the area with food and water, Concannon responded, "absolutely, I could hear them in the wall," and "[t]here is water, there is food everywhere in the house, there is food in the garage."

{¶ 26} Concannon testified that Exhibit 15 depicted one of the bedrooms that was "kind of barricaded" inside by a metal cage. She stated that two of cats she observed

were depicted in the photo. She stated that it was summer time, "the air was running, but again, here is one of the windows that was propped open with a screen and cats that had been up in the window trying to breatht[e] the fresh air." Concannon testified that the two cats were unable to leave the room.

{¶ 27} Concannon stated that Exhibit 16 depicted "the back room that has been built onto the house, it's kind of like a Florida room or just a bunch of windows." She stated that the room contained 13 litter boxes, and that four of them "have been doubled up instead of cleaned out," meaning that someone "just piled on top of the fecal matter and urine, the dirty litter, on top of the other[ ] ones and again, these are huge, large moving bins."

{¶ 28} Regarding Exhibit 17, Concannon testified that "this would be the garage that we have been explaining that is propped open all winter, all summer, where the cats can go in and out at all times." She stated that the access stairs to the attic are pulled down into the garage, and "you can see the baiting of the food or luring of the food, * * * a little bit of water * * * and again, its like this every time I have been out there." Concannon testified that the photo also depicts "another chewy box over here where cats can go in and hide." Concannon testified that Exhibit 18 depicted the remains of a deceased kitten that she discovered in the garage and removed to the yard to photograph due the darkness in the garage.

{¶ 29} Concannon testified that she photographed the cats that were removed from the home. She stated that Exhibit 1 depicted the kitten that fell down the sewer drain and was unable to see due to a ruptured eye. Concannon stated that Exhibit 3 depicted a cat with swollen eyes and nasal discharge, indicating a severe upper

respiratory infection and feline herpes. Concannon stated that Exhibit 4 depicted a cat with "extreme ocular discharge" and "walking dandruff, which is zoonotic," meaning "it is transferable to humans." She stated that Exhibit 5 depicted "the second cat that succumbed to the injuries, it could not see at all, could not breath[e]." Concannon stated that the cat had to be euthanized. Concannon testified that Exhibits 7 and 8 depicted cats "that could not see at all, nasal discharge, ocular discharge." She stated that "they were all contagious." She stated that the cats removed were of different ages and litters, and that seven cats were removed from the outside of the residence and the rest were taken from the inside. According to Concannon, she could "not catch the remaining. There were multiple cats inside the residence and in the walls, in the ceilings." Concannon stated all but the two cats who died improved substantially over a short period of time, and all but one have been adopted. She stated that all but two of the adopted cats "have health disclaimers because they are going to have the chronic upper respiratory" issues.

{¶ 30} Concannon testified that Diamond advised her "that she couldn't handle them all, she wasn't aware of any of the cats being sick * * *." According to Concannon, "I explained to her that Tom Scott has been out there, that the health department has been out there, I have been out there, she has stated that she was unaware of information that I know that I specifically stated to her regarding the zoonotic illness of the cats and being contagious to humans, which would cause itching and scratching of the skin." Concannon testified that Diamond acknowledged being the owner of the cats and indicated that "no one would help her." When asked by the court if it were possible that Diamond "started out good heartedly trying to take care of cats and got in over her head,"

Concannon responded, "Absolutely and that's how hoarding starts."

{¶ 31} After the State rested, Diamond called Rebecca Vonricker, Diamond's next door neighbor of 10-11 years, to testify. Vonricker testified that she is employed at an animal hospital as a "vet tech." She testified that she used to go over to Diamond's home once or twice a week on a regular basis to assist her with her cats. According to Vonricker, she helped "medicate, * * * help her with the litter boxes, she needs like flea prevention * * * ," and "if they need any antibiotics I help administrate it." When asked if she observed "any issues" with the cats, the prosecutor objected, asserting that Vonricker's testimony violates the discovery rule "about providing names of witnesses, but now we don't have an expert report and we are essentially giving an expert report." The court responded as follows:

> I get it, but what I am going to say is I am going to let Mr. Huelsman have some extremely broad . . . inaudible . . . because I can't imagine him being able to come up with any defense that is going to salvage her having 27 cats, now unless she is putting on a production on cats, there is no reason in the world for anyone to own 27 cats and it's obvious that she couldn't care for them. I am happy to hear this witness testify, so proceed and let's see what she has to say.

{¶ 32} Vonricker testified that she was at Diamond's home just prior to the removal of the cats, assisting Diamond with flea prevention and heartworm prevention. She stated that the cats were "not like deathly sick, no." According to Vonricker, the cats "might have had like runny nose like sneezing, but that is common." She testified that "with antibiotics the upper respiratory, it will go away." When asked about cleaning the

litter boxes. Vonricker replied, "I was doing it like maybe two or three times a week." She stated that she has four cats herself, and "I have to clean the litter boxes like every day." Vonricker testified that she did not observe any cats that she felt were neglected, and that Diamond "would actually put the cats before her." She stated that Diamond "will feed and give them cat litter before she would actually eat herself." When asked if she observed Diamond make efforts to find homes for the cats, Vonricker responded that she had "seen rescue groups come to her house and take cats, to spay and neuter, like trap and release and people drop off cats at her door, too."

{¶ 33} Vonricker testified that last year she "re-homed" some of the pregnant cats to a client at work who in turn found permanent homes for them. At the conclusion of Vonricker's testimony, when asked by the court how many cats are too many cats, she responded, "I guess when you can't take of them." She further stated that she knows "somebody who has 30 cats and she takes care of them. She gives them medical treatment, food, water, litter box."

{¶ 34} The following exchange then occurred:

Q. * * * Do you want to cross examine?

A. Yes Your Honor.

THE COURT: I don't know why, she has answered your question, * * * if it's okay to have 30 cats, obviously her testimony is slanted, it would never be okay for anybody to have 30 cats, I don't care if you are the mother Theresa of cats, you can't have 30 cats, it's not possible for a human being to take care of 30 cats. She can say yes, I'm the Judge and [I] get to say no. Now if you want to ask your questions, feel free.

**{¶ 35}**  On cross-examination, Vonricker testified that she is not a registered vet tech, and that she "did not pass my boards."  She testified that she has an "associate's degree in science for a veterinarian technology."  She stated that she did not begin going to Diamond's house with regularity until "like last year," in May, prior to the June 4, 2017 removal of the cats by Concannon.  When pressed further, she indicated that it was "[p]robably like a week before" the removal, and that she had only been there once or twice.  Vonricker testified that she was at Diamond's home for "like a half hour, hour."

**{¶ 36}**  When asked what it was like to enter the home, Vonricker replied that "it wasn't bad."  The prosecutor showed Vonricker Exhibits 9 10, 11, 13, 14, 15, and 16, and she acknowledged that before the removal of the cats the condition of the home was horrible.  Vonricker acknowledged the multiple tubs of cat litter depicted in Exhibit 16, and that cats will not use a full litter box.  Vonricker testified that the smell in the home "was bad."  She stated that a quarter of the cats appeared to have upper respiratory infections, and she acknowledged that that is a high number cats to be ill at once.  Vonricker acknowledged that the cats depicted in Exhibits 1 and 2 appeared to be in need of immediate veterinarian care.

**{¶ 37}**  Caroline Cunliffe testified that she resides in Dayton and is Diamond's daughter. Cunliffe testified that Diamond relocated multiple cats to the humane society or adoption agencies.  She stated that she attempted to assist her mother with the cats by "helping her clean, or again, just relocating the cats was the main issue."  Cunliffe testified that she has not been helping as much lately, "because of everything that has been going on, I just have tried to stay a little bit out of it."

**{¶ 38}**  Finally, Diamond testified.  She stated that she has resided at the

Washington Park Drive home for 17 years, and that she initially owned three cats. She stated that she began to help cats in 2013 that were being dropped off in the area of Mardell Drive and Graceland Street, and that "it was manageable at that time." She stated that people began dropping off cats at her home, and that she "had a good relationship with the humane society for many years, I volunteered from 1999, I fostered for them, * * * we had a relationship where I would foster these cats that were trapped and socialize them and pay for all the food and everything and then when they were old enough and socialized, the humane society would take them and put them up for adoption." She stated that the humane society discontinued the "program where if you find a litter of kittens and you are willing to foster them that the humane society could enter into the agreement that I had, they changed the agreement and said that we don't do that anymore, so I had to find other resources."

{¶ 39} Diamond testified that in 2014, she contacted the humane society about a problem with outside cats at her home, and that they responded and removed two of her inside cats and "nothing was done with the outside cats." She stated that SICSA (a pet adoption center) charges a fee to take cats. According to Diamond, "Greene County and Warren County have helped me to trap, neuter and either bring home or return them to my house." She stated that she did all she could, and that she "didn't want to contaminate the inside cats that I had had all this time, so I tried to keep them separated. That's why when I was told not to feed outside, I started feeding the feral in my garage."

{¶ 40} Diamond stated that in 2016, she received a notice from Concannon, and that she phoned her as advised. Diamond stated that she explained to Concannon that she contacted "Alley Cat Allies * * * and they gave me a list of resources and that I had

some local trappers and I said as a matter of fact they are coming tonight to trap, I said I have been working on this for years and we have a good handle on it, I know that the cats are [a] problem and nobody wants them gone more than I do." Diamond testified that, after the trappers arrived, so did Concannon, and that after speaking with her, they left. She stated that she has since had difficulty getting anyone to come to her home to trap the cats. When asked who she tried to contact regarding "rehoming" the cats, she replied, "I have seven pages of agencies all over the state of Ohio."

{¶ 41} When asked about the cats inside her home that were depicted with mucus on them, Diamond responded that "[t]hose kittens had just been brought into my house," and that "the feral mothers would have them either in my attic or * * * garage." She stated that "the mother brings the babies to the food source, which would be my garage, that's how you control the colony, you need to know how many there are and what condition they are in. They were still nursing." Diamond testified that she "would bring them in and I would clean their eyes, again they are feral kittens so it wasn't always easy to catch one. One of them in the picture hadn't even been in the house 24 hours." She stated that she "did the best I could, the humane society wouldn't take them * * *."

{¶ 42} On cross examination, Diamond stated that regarding each individual cat, she kept "spreadsheets on who is who." When asked if, after the humane society removed the cats, 25 to 28 remained on her property, she responded, "I think so, I would have to look at my notes." She stated that more kittens were born after the removal. When asked if she had more cats than she could possibly care for from June 2016 to June 2017, Diamond responded, "[y]es." The following exchange occurred:

Q. And how many litters of kittens did you take in in that one year?

A.  Three.

Q.  You took in three litters of kittens at a time when you knew that you had too many animals.

A.  [T]hey were born in my garage.

Q.  They were born in your garage, but you put food there for them and lured them into the garage.

Q.  No, I was controlling the colony to get them spayed and natured. [sic]

Q.  Ma'am, didn't you put food in the garage.

A.  To feed the colony.

* * *

Q.  Have you seen these exhibits that showed the interior of your house ma'am?

A.  I am well familiar with the interior of my house.

* * *

Q.  Those are accurate depictions of what your house was like, I'm sorry it's hard to face, but those are accurate, right?

A. Yes.

Q.  And it burns your eyes and nose, right?

A.  It's horrible.

**{¶ 43}**  After the bench trial, Diamond was convicted and sentenced as described above.

**{¶ 44}**  Diamond asserts a single assignment of error herein, with subparts, as follows:

THE TRIAL DEFENSE COUNSEL WAS INEFFECTIVE, IN TURN LEADING TO VIOLATIONS OF THE DEFENDANT'S FOURTH, SIXTH, AND FOURTEENTH AMENDMENT RIGHTS.

1. Lack of Contact/ Communication

2. Lack of Humane Society Assistance

3. Lack of Challenge of False Narratives

4. Lack of Challenge of Potential Fourth Amendment Violations

{¶ 45}  Diamond argues that the State failed to meet its burden with respect to R.C. 969.131(D)(1), "or in the alternative, the State met this burden yet [Diamond] was not allowed to present a competent defense due to palpable and judgment-altering attorney ineffectiveness that led to injustice in the case at bar."  She asserts that "the State cannot have it both ways; on one hand argue that [she] was 'over her head' and that she did not mean to harm the cats, then on the other hand argue that she was negligent per statutory definition."

{¶ 46} Diamond asserts that "several transcribed statements made from the bench at the end of this trial infer inherent bias against [her.]"  Diamond argues that "a mistrial should have immediately been orally requested by defense counsel.  There were multiple instances where the bench indicated that the case had been prejudged and that [Diamond] was guilty well before the evidence was complete[l]y presented."

{¶ 47}  Regarding defense counsel's lack of contact and communication, Diamond argues that she requested a meeting with defense counsel "no less than three" times "to schedule a time to meet prior to the trial and explain her side of the story.  A meeting never happened."  Diamond names nine witnesses in her brief that "she wanted her

attorney to interview and prep for trial. She was confident that each and every one of these witnesses would have testified that she had regularly adopted out cats that she received involuntarily from her neighbors." Diamond directs our attention to Vonricker's testimony. She argues that the transcript "includes references to the defense's failure [to] * * * prepare witnesses, let alone identify those witnesses to the State." Diamond argues that she "wanted to tell her counsel that she had asked numerous times for the Montgomery County Humane Society to step in and help," and that while the agency promised assistance, it was never provided. Diamond asserts that she "wanted to discuss with trial counsel what she perceived" as an "unlawful search and seizure" in violation of the Fourth Amendment.

{¶ 48} Regarding lack of humane society assistance, Diamond asserts that hers and Cunliffe's testimony support the argument that Diamond requested help from the humane society on "several occasions" but was "rebuffed." She asserts that testimony "was clear that [she] had numerous people cleaning, feeding, and caring for the cats as she tried to find homes for as many as she could as expeditiously as she could."

{¶ 49} Regarding defense counsel's lack of challenge of a false narrative, Diamond argues that "defense counsel's failure to state for preservation of the record that additional witnesses were available and failure to proffer the nature of those witnesses' anticipated testimony along with its relevance to the defense of the case was improper and may well be seen as reversible error." Diamond argues that "[d]amning statements were made by the State's witnesses that went unchallenged," and she asserts that Concannon "stated that she personally brought food for the cats," which was "patently false, yet never challenged." Diamond asserts that defense counsel failed to ask her for proof of the

medical treatment she sought and food she provided for the cats, which she asserts amounted to "a sum of more than $7,000/year." She asserts that she found homes for more than 20 cats, "yet this issue was never raised by her counsel." According to Diamond, many "of the potential defense witnesses who were never called would have testified to many cats being successfully adopted out, some to them and some to other local parties."

**{¶ 50}** Regarding the lack of challenge to potential Fourth Amendment violations, Diamond argues that defense counsel "failed to challenge the Humane Society's right to harass [her]" or search her home prior to getting warrant. She argues that there "was discussion of warnings and notices being placed at the house in 2013, 2015 and 2016, but yet no proof those documents were ever received." Diamond asserts that this "appears to have been a clear violation of [her] Fourth Amendment rights against illegal search and seizure, yet no challenge was recorded in the Transcript." According to Diamond, "there is no indication that the Humane Society secured a warrant to come onto [her] property or inside her home until June 4, 2017; though they were regularly on or around the subject property." She argues the human society had "plenty of time * * * to secure a warrant to enter the curtilage and residence proper if they suspected abuse." She argues that the notices and warnings left at her home "are a far cry from a court-approved warrant." According to Diamond, while the Humane Society "does have some access rights in cases of demonstrated danger to animals or people, this is still an issue in controversy that should have at least been challenged and thus preserved for appeal."

**{¶ 51}** The State responds that "even the best lawyer cannot change the facts. Appellant cannot prevail on a claim of ineffective assistance of counsel where, as in this

case, the remaining evidence, unrelated to trial counsel's alleged errors, constitutes overwhelming evidence of guilt." The State argues that it "is not necessary to prove that Appellant *wanted* the animals to suffer."

{¶ 52} The State asserts that the "transcript reveals that Appellant's trial counsel mounted a vigorous defense on behalf of his client. Each of the State's witnesses were subjected to thorough cross-examination and often re-cross. Appellant's trial counsel made numerous objections and motions to strike."

{¶ 53} Regarding the judge's comments, the State notes that, while Diamond asserts that counsel was ineffective for failing to move for a mistrial, she does not argue "that the trial court's comments denied her a fair trial." The State asserts that defense counsel "would know that the chances of removing the trial judge would be uncertain at best; and to what end? The new trier-of-fact would be presented with the same, overwhelming evidence of animal hoarding and neglect."

{¶ 54} Regarding defense counsel's alleged failure to consult with Diamond and prepare additional witnesses, the State argues that Diamond "chose to take the stand and was given a full opportunity to explain everything she did to care for the cats. Testimony submitted merely to reiterate those efforts would have necessarily been duplicative and subject to exclusion pursuant to Evid. R. 403(B)."

{¶ 55} Finally, regarding defense counsel's failure to file a motion to suppress, the State asserts that Diamond does not identify in the record what actions were taken by law enforcement to violate her Fourth Amendment rights. According to the State, "[r]ather than the police intruding upon Appellant, the Appellant's conduct intruded upon the public." Finally, the State asserts that even "if all of the warning notices were not in

evidence, all of the testimony and evidence from the June 4th search itself would remain."

{¶ 56} As this Court has previously noted:

It is well established that ineffective assistance of counsel affects a substantial right afforded by the United States and Ohio Constitutions. *Strickland v. Washington,* [466 U.S. 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)]*; State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). "Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance, and a defendant, in order to overcome the presumption that counsel is competent, must show that counsel's decisions were 'not trial strategies prompted by reasonable professional judgment.' " *State v. Few,* 2d Dist. Montgomery No. 21561, 2012–Ohio–5407, ¶ 10, quoting *Strickland* at 687. "Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel." *Id.*at ¶ 11, quoting *State v. Nabors,* 2d Dist. Montgomery No. 24582, 2012–Ohio–4757, ¶ 17. "Even if unsuccessful, strategic decisions will not constitute ineffective assistance of counsel." *Id.,* citing *State v. Carter,* 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995). Generally, the decision regarding which defense to pursue at trial is a matter of trial strategy, and trial strategy decisions are not a basis of a finding of ineffective assistance of counsel. *State v. Moss,* 2d Dist. Montgomery No. 22496, 2008–Ohio–6969, ¶ 35, citing *State v. Murphy,* 91 Ohio St.3d 516, 524, 747

N.E.2d 765 (2001); *State v.* Dixon, 101 Ohio St.3d 328, 2004–Ohio–1585, 805 N.E.2d 1042, ¶ 52[.]

*State v. Dover*, 2d Dist. Clark No. 2013-CA-58, 2015-Ohio-4785, ¶ 10.

**{¶ 57}** Diamond was convicted of violating R.C. 959.131(D)(1) and (2), which provide:

> (D) No person who confines or who is the custodian or caretaker of a companion animal shall negligently do any of the following:
>
> (1) Torture, torment, or commit an act of cruelty against the companion animal;
>
> (2) Deprive the companion animal of necessary sustenance or confine the companion animal without supplying it during the confinement with sufficient quantities of good, wholesome food and water if it can reasonably be expected that the companion animal would become sick or suffer in any other way as a result of or due to the deprivation or confinement.

**{¶ 58}** We agree with the State that ineffective assistance of counsel is not demonstrated. Before addressing Diamond's individual arguments, we note that the evidence in the record obtained pursuant to the warrant thoroughly and conclusively established that Diamond had an inability to provide even a minimum standard of nutrition, sanitation, shelter, and veterinary care for the cats at her home, resulting in emaciated animals suffering severe illness and parasitic infestation, and in the cases of the carcass found in her garage and the two cats who did not survive the removal, death. The deterioration of Diamond's home further resulted from Diamond's inability to provide

for the cats, with photos depicting floors and counters covered with feces, and witnesses testifying about the stench of the home, the insect infestation, and the presence of vermin. This is overwhelming evidence of guilt as charged.

{¶ 59} Regarding Diamond's assertion that defense counsel was ineffective in failing to move for a mistrial after the comments from the bench about the number of cats in Diamond's home, we note the comments were not made in the presence of a jury, and that " '[a] judge is presumed to follow the law and not to be biased, and the appearance of bias or prejudice must be compelling to overcome these presumptions.' *In re Disqualification of George,* 100 Ohio St.3d 1241, 2003-Ohio-5489, 798 N.E.2d 23, ¶ 5." *State v. Hall*, 2d Dist. Montgomery No. 25858, 2014-Ohio-416, ¶ 9. Importantly, we agree with the State that the record establishes overwhelming evidence of Diamond's guilt. Although the trial court's blanket statement regarding ownership of 27 cats was perhaps ill-advised, unquestionably this record illustrates Diamond was incapable of caring for so many cats, and the evidence adduced bears a reasonable relationship to the trial court's comment. We cannot find prejudice is established. We conclude that ineffective assistance is not demonstrated in counsel's failure to move for a mistrial.

{¶ 60} Regarding defense counsel's alleged failure to meet with Diamond ahead of trial so that she could "explain her side of the story," and his alleged failure to contact and prepare her "extensive list of witnesses," we again conclude that ineffective assistance is not demonstrated. It is clear that defense counsel understood and presented Diamond's "side of the story." Counsel's defense of Diamond was consistent with her testimony that she has a big heart, loved the cats, and sacrificed for their benefit, but was simply overwhelmed by the task of caring for them.

{¶ 61} As this Court noted in *State v. Royster,* 2d Dist. Montgomery No. 26378, 2015-Ohio-625*,* ¶ 27:

" 'Generally, counsel's decision whether to call a witness falls within the rubric of trial strategy and will not be second-guessed by a reviewing court.' " *State v. Were,* 118 Ohio St.3d 448, 2008–Ohio–7762, 890 N.E.2d 263, ¶ 222, quoting *State v. Treesh,* 90 Ohio St.3d 460, 490, 739 N.E.2d 749 (2001). Moreover, " 'attorneys need not pursue every conceivable avenue; they are entitled to be selective.' " *State v. Murphy,* 91 Ohio St.3d 516, 542, 747 N.E.2d 765 (2001), quoting *U.S. v. Davenport,* 986 F.2d 1047, 1049 (7th Cir.1983). "Even unsuccessful tactical or strategic decisions will not constitute ineffective assistance of counsel." *State v. Williams,* 2d Dist. Montgomery No. 24548, 2012–Ohio–4197, ¶ 28, citing *State v. Carter,* 72 Ohio St.3d 545, 558, 651 N.E.2d 965 (1995).

{¶ 62} We conclude that counsel may have reasonably concluded that additional witnesses would be merely cumulative of Diamond's testimony, or duplicative of Vonricker's and Cunliffe's, who testified regarding Diamond's efforts with the cats and ultimately acknowledged that Diamond could not keep up with caring for them. We further conclude that no amount of witness testimony could overcome the testimony of State's witnesses corroborated by the damning evidence in the photographs admitted into evidence, which defense counsel likely realized.

{¶ 63} While Diamond asserts that she "wanted to tell her counsel" that she requested help from the Humane Society, and that help in turn was promised but not delivered, we note that Diamond herself so testified at trial. While she argues that the

"situation simply got 'out of hand,' " the trier of fact was free to reject this defense. Concannon testified that she explained to Diamond that she needed to close her garage door and retract the attic stairs, and that she also offered "multiple types of help," as set forth above. Concannon testified that Diamond "did just the opposite of what I suggested." Given Concannon's clear testimony, and the photographic evidence, we cannot conclude that counsel's failure to adduce further evidence of the humane society's response to the cats at Diamond's home prejudiced her. In other words, the outcome of the trial would not have been different had defense counsel done so, and ineffective assistance is not demonstrated.

{¶ 64} Regarding Diamond's assertion that defense counsel failed to challenge a "false narrative," we cannot agree that "counsel's failure to state for preservation of the record" that additional witnesses were available and to proffer the nature of those witnesses' testimony was improper or reversible error, as Diamond asserts. While Diamond notes that evidence was adduced that she failed to care for the ill cats, she directs our attention in the transcript to the testimony of her daughter, her own witness. While she may have had multiple receipts for expenditures for the cats, the condition of the cats and her home as evidenced by the photos and direct testimony belies the effectiveness of her care. Thus, we cannot conclude that defense counsel was ineffective for failing to enter the receipts into evidence. While she argues that Concannon falsely testified that she provided food for the cats, in the exchange to which Diamond directs our attention, Concannon testified that she *offered* to provide "traps, spay, neuter, food if she needed, * * *," and as noted above, Diamond refused the offers. Even if Diamond "had adopted out more than 20 cats," the numerous remaining cats were

subjected to conditions which constitute cruelty. Ineffective assistance is not demonstrated.

**{¶ 65}** Finally, regarding her assertion that defense counsel was ineffective for failing to file a motion to suppress, we again find that ineffective assistance is not demonstrated.

It is fundamental that searches conducted outside the judicial process, without a warrant, are per se unreasonable, subject to a few specifically established and well-delineated exceptions. *Katz v. United States*, (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576. The burden is on those seeking an exemption from the constitutional process to show the need for it.

*State v. Peterson*, 173 Ohio App.3d 575, 2007-Ohio-5667, 879 N.E.2d 806, ¶ 11.

**{¶ 66}** As noted by the Fifth District:

* * * "The curtilage is an area around a person's home upon which he or she may reasonably expect the sanctity and privacy of the home. For Fourth Amendment purposes, the curtilage is considered part of the home itself." *Oliver v. United States*, 466 U.S. 170, 1800, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). The only areas where officers may lawfully go are those impliedly open to the public, including walkways, driveways, or access routes to the house. *State v. Cook,* 5th Dist. Muskingum Nos. 2010-CA-40, 2010-CA-41, 2011-Ohio-1776*,* ¶ 65, citing *State v. Birdsall,* 6th Dist. Williams No. WM-09-016, 2010-Ohio-2382, ¶ 13.

*State v. Schorr*, 5th Dist. Fairfield No. 13-CA-45, 2014-Ohio-2992, ¶ 28.

**{¶ 67}** As this Court has further noted:

"The failure to file a motion to suppress does not necessarily constitute ineffective assistance of counsel." *State v. Layne*, 12th Dist. Clermont No. CA2009-07-043, 2010-Ohio-2308, ¶ 46, citing *State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000). It is only considered ineffective assistance of counsel when the record demonstrates that the motion to suppress would have been successful if made. *State v. Resendiz*, 12th Dist. Preble No. CA2002-03-026, 2002-Ohio-5455, ¶ 11. The court in *Resendiz* presumed that trial counsel was effective if he could have reasonably decided that filing a suppression motion would be a futile act, even if there is some evidence in the record to support a motion. *Resendiz* at ¶ 29. * * *

* * *

"Where the basis of an ineffective assistance of counsel claim is counsel's failure to file a motion to suppress evidence, the defendant making that claim must prove that the basis of the suggested suppression claim is meritorious." *In re D.D.*, 2d Dist. Montgomery No. 22740, 2009-Ohio-808, ¶ 3, citing *Kimmelman v. Morrison*, 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed. 305 (1986); *State v. Pillow*, 2d Dist. Greene No. 07CA95, 2008-Ohio-6046.

*State v. Black*, 2d Dist. Montgomery Nos. 26986, 26991, 2016-Ohio-7901, ¶ 26, 28.

**{¶ 68}** There is no indication that Concannon "searched" Diamond's house prior to obtaining the warrant, as Diamond suggests, and she was entitled to approach

Diamond's home via her driveway and walkway to post the notices. The cats she described seeing were in plain view coming and going from the open garage, sitting in the open windows, and in the yard. Nothing in this record suggests even remotely that a motion to suppress would have been granted.

**{¶ 69}** Since ineffective assistance of counsel is not demonstrated, Diamond's sole assignment of error is overruled, and the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

Copies mailed to:

J. Jeffrey Holland
Mark J. Bamberger
Hon. Robert W. Rettich, III