[Cite as *State v. McPeek*, 2024-Ohio-2008.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 29959 |
| | : | |
| v. | : | Trial Court Case No. 2022 CR 02502 |
| | : | |
| BONNIE MCPEEK | : | (Criminal Appeal from Common Pleas Court) |
| | : | |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on May 24, 2024

. . . . . . . . . . .

MICHAEL MILLS, Attorney for Appellant

MATHIAS H. HECK, JR., by NATHAN B. VANDERHORST, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Defendant-Appellant Bonnie McPeek appeals from her conviction in the Montgomery County Court of Common Pleas after she pleaded no contest to one count of tampering with evidence and was sentenced to community control sanctions. For the reasons that follow, the judgment of the trial court will be reversed, and the matter will be remanded for further proceedings.

## I.      Facts and Procedural History

{¶ 2} In the summer of 2022, officers of the Riverside Police Department had tried unsuccessfully to effectuate arrest warrants on two males they believed resided at 1158 Jeanette Drive. According to the record, they had tried knocking on the door of the house on several occasions, but no one would answer. This was a house that had frequent criminal activity, and the Riverside police had previously made multiple felony arrests there.

{¶ 3} On the early evening of August 26, 2022, Officer Matthew Jackson was patrolling the area and noticed a male at the Jeanette residence working on a car in the driveway. However, because of the distance from the road, he was unsure whether the male was one of the suspects he was looking for. He decided to investigate and radioed Sergeant James Vance for assistance.

{¶ 4} When Sgt. Vance arrived, the two officers parked their cruisers on the street in front of the house and approached. As they made their way up the driveway (which led eventually to a detached garage at the back of the property), they passed the front of the house where a walkway led to the front door. They continued on the driveway, sidestepping a silver car, and reached the back of the house where two more vehicles were sitting. Looking to the left, beyond the back corner of the house, they spotted two women and a dog sitting on a concrete patio at the other corner of the back side of the house.   The house was seemingly abandoned, as Officer Jackson noted that it had no electricity.

{¶ 5} Officer Jackson approached the women, and Sgt. Vance spoke with the male

working on the vehicle. Jackson noticed that the younger woman (soon identified as McPeek) was holding a pipe; he immediately knew it was drug paraphernalia. When asked, she confirmed it was a marijuana pipe. Within an arm's length of McPeek, he also saw an ID card with two lines of brown powder on it. He removed the women from the proximity of the objects and then went back to his car to get items to secure the evidence. Sgt. Vance spoke with the male and the older female while Officer Jackson looked for the evidence containers in his cruiser. McPeek was seated on a lawn chair on the other side of the back yard.

{¶ 6} When he returned to the back yard several minutes later, Officer Jackson found that the "tray that had the powder stuff was moved to a table and the pipe was gone." Suppression Tr. at 16. McPeek was questioned about the missing evidence but claimed she knew nothing. She was then handcuffed and arrested for tampering with evidence as well as possession of drug paraphernalia.

{¶ 7} On September 28, 2022, McPeek was indicted on one count of tampering with evidence, a third-degree felony, and one count of possession of drug paraphernalia, a fourth-degree misdemeanor. She later filed a motion to suppress evidence, arguing that it was obtained by a warrantless search of the property. Specifically, she alleged that her Fourth Amendment rights had been violated when officers entered the curtilage of the home unreasonably and without a warrant. After a hearing on the matter and briefing from the parties, the trial court overruled the motion. McPeek then pleaded no contest to the tampering charge, and the misdemeanor was dismissed. She was sentenced to community control sanctions.

{¶ 8} McPeek has filed a timely appeal with a single assignment of error.

**II.     The Fourth Amendment and Suppression of Evidence**

{¶ 9} In her assignment of error, McPeek argues that the trial court erred in overruling her motion to suppress.

Motions to Suppress

{¶ 10} An appeal from a ruling on a motion to suppress presents a mixed question of facts and law. *State v. Ojezua*, 2016-Ohio-2659, 50 N.E.3d 14, ¶ 15 (2d. Dist.). When considering a motion to suppress, the trial court takes on the role of trier of fact and is in the best position to resolve factual questions and assess the credibility of witnesses. *State v. Turner*, 2015-Ohio-4612, 48 N.E.3d 981, ¶ 10 (2d Dist.). We must accept the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* "Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard." *Id.*, quoting *State v. Koon*, 2d Dist. Montgomery No. 26296, 2015-Ohio-1326, ¶ 13. The trial court's application of law to the findings of fact is subject to a de novo standard of review. *Id.*

Fourth Amendment

{¶ 11} The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution prohibit the police from conducting unreasonable searches and seizures. The Fourth Amendment states: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

{¶ 12} Similarly, Section 14, Article 1 of the Ohio Constitution reads: "The right of the people to be secure in their persons, houses, papers, and possessions, against unreasonable searches and seizures shall not be violated; and no warrant shall issue, but upon probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the person and things to be seized."

{¶ 13} Evidence obtained in violation of the constitutional provisions will generally be excluded from trial under the "exclusionary rule." *Mapp v. Ohio*, 367 U.S. 643, 655, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *State v. Turpin*, 2017-Ohio-7435, 96 N.E.3d 1171, ¶ 11 (2d Dist.).

{¶ 14} The gravamen of McPeek's argument is that her Fourth Amendment rights were violated because the officers had no right to be in the backyard of the property where she was found with contraband. The State counters with two possible explanations. First, Officer Jackson and Sgt. Vance had arrest warrants for two men they believed lived at the house. Second, the officers had an implied license to approach the home, and McPeek's contraband was in plain view.

Standing

{¶ 15} We must begin with a brief discussion of standing. One of the key tenets of Fourth Amendment jurisprudence is that "the Fourth Amendment protects people, not places." *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). To benefit from that protection, a person must first exhibit an actual (subjective)

expectation of privacy and, two, that expectation must be one that society is prepared to recognize as "reasonable." *Id.* at 261 (Harlan, J., concurring).

**{¶ 16}** Because the lynchpin of the Fourth Amendment analysis is a person's expectation of privacy, the closer the relationship a person has to the place searched, the greater the expectation of privacy. A person has a significant expectation of privacy in his or her home, some expectation of privacy as a guest in another's home, and little to none in a place with which he or she had no connections. *See* Fourth Amendment (granting the right of people to be secure in **their** home); *Minnesota v. Olson*, 495 U.S. 91, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) (a person may have a legitimate expectation of privacy in the home of someone else as an overnight guest); *State v. Dubose*, 2005-Ohio-6602, 843 N.E.2d 1222, ¶ 39 (7th Dist.) ("If a person has no possessory or property interest in the place searched * * *, it is often difficult to establish that a legitimate expectation of privacy has been violated."). Without a reasonable expectation of privacy, a person does not have standing to challenge the search.

**{¶ 17}** It is apparent from the record that McPeek did not have standing to challenge the search in this case. She did not live at the home and did not have permission to be there. In fact, she had no idea whose house it was. Nevertheless, both in the trial court and now on appeal, the State waived this issue by failing to raise it. Therefore, our analysis begins with the idea that McPeek had standing to challenge the search and had Fourth Amendment protection in the backyard of the house.

Arrest Warrants

**{¶ 18}** The first argument the State presents is that the Riverside officers were

legally on the property to execute valid arrest warrants.

{¶ 19} "[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Payton v. New York*, 445 U.S. 573, 603, 100 S.Ct. 1371, 1388, 63 L.Ed.2d 639 (1980). Accordingly, an arrest warrant is sufficient to enter a home (or in this case, the back yard) if officers (1) have reason to believe that the suspect lives in the home, and (2) is in fact at the home at the time the arrest warrant is executed. *State v. Cooks*, 2d Dist. Clark No. 2016-CA-40, 2017-Ohio-218, ¶ 10.

{¶ 20} Both officers testified at the suppression hearing that they had good reason to believe that the men they were looking for lived (or at the very least frequented) the house at 1158 Jeanette Drive. Sgt. Vance testified that he had previously spoken with neighbors who confirmed that one of the men lived there, and Officer Jackson told the court that he had arrested one of the men at that house before and that address was listed on the warrant.

{¶ 21} On the other hand, Sgt. Vance admitted that he had no indication the men they were looking for were actually present that day. Suppression Tr. at 46, 50. Likewise, Officer Jackson testified that he did not know if the men with the felony warrants were at the house. Suppression Tr. at 29. While the officers believed the suspects lived at the Jeanette address, they did not have any idea if they were home when the officers arrived to execute the warrant. The arrest warrant explanation, therefore, did not provide a reason for the officers to be legally in the backyard.

<u>Curtilage and License</u>

**{¶ 22}** The State's alternative argument is that the Riverside officers had an implied license to approach the home and enter its curtilage.

**{¶ 23}** "The curtilage is an area around a person's home upon which he or she may reasonably expect the sanctity and privacy of the home. For Fourth Amendment purposes, the curtilage is considered part of the home itself." *Oliver v. United States*, 466 U.S. 170, 1800, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984). Because the curtilage of a property is considered to be part of a person's home, the right of law enforcement to come into the curtilage is highly circumscribed. *State v. Stevens*, 2023-Ohio-889, 210 N.E.3d 1154, ¶ 24 (5th Dist.).

**{¶ 24}** The only areas where officers may lawfully go are those that are impliedly open to the public, including walkways, driveways, or access routes to the house. *State v. Diamond*, 2d Dist. Montgomery No. 27904, 2018-Ohio-3287, ¶ 66. The guiding principle is that "a police officer on legitimate business may go where any 'reasonably respectful citizen' may go." (Citation omitted.) *State v. Birdsall*, 6th Dist. Williams No. WM-09-016, 2010-Ohio-2382, ¶ 13. "Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is 'no more than any private citizen might do.' " *Florida v. Jardines*, 569 U.S. 1, 8, 133 S.Ct. 1409, 185 L.Ed.2d 495 (2012), quoting *Kentucky v. King,* 563 U.S. 452, 469, 131 S.Ct. 1849, 179 L.Ed.2d 865 (2011).

**{¶ 25}** To help with the analysis, the United States Supreme Court has developed four factors for determining whether an area is within the protected curtilage of a house: (1) the proximity of the area claimed to be curtilage to the home; (2) whether the area is

included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the areas from observation by passersby. *United States v. Dunn*, 480 U.S. 294, 302-303, 107 S.Ct. 1134, 94 L.Ed.2d 326 (1987). Based on those guidelines, we must conclude that the officers went further than the Fourth Amendment permits and improperly ventured into the curtilage of the house.

{¶ 26} The officers did not attempt to knock on the front door. The body camera footage shows Officer Jackson and Sgt. Vance exited their vehicles (which were parked on the street in front of the house) and walked up the long driveway, which first led toward the house and then then continued to the backyard. They could have taken the short walkway to the front door, but instead continued straight, past the front corner of the house. They walked between the side of the house (on their left) and an older model car (on their right) which sat at the edge of the driveway and back corner of the house. Past the car and corner of the house, a man was working on a truck, and a concrete patio on the left stretched nearly the width of the house. It was there that Officer Jackson saw McPeek, seated at the far edge of the patio, drug pipe in-hand.

{¶ 27} The actions of the officers were not malicious, but the officers overstepped their bounds and went where a "reasonably respectful citizen" would not be permitted to go. Under normal circumstances, it would be reasonable for an ordinary citizen (or police officer) to ask a person working on a truck in his or her driveway in the front of the house if a particular person were present. The same would likely apply to person in an open garage attached to the house. Both of those locations are *generally* open to the public.

But here, the officers (while admittedly still on the driveway) walked past the front yard, past the walkway leading to the front door, past a "no trespassing sign," past a car, and past the entire length of the house before they encountered any person. The women they then saw were at the other end of the house – clearly not visible from the road – and instead of asking if the men with warrants were there, Officer Jackson said "How ya'll doin? Whatcha got there?" At the hearing, Officer Jackson described McPeek as sitting "towards the other side of the backyard." It was not until several minutes into Sgt. Vance's interaction with the man working on the truck that the wanted men were even mentioned.

{¶ 28} The State argues, and the trial court found, that "the police approached [the man] on the driveway, which would be no different than any other member of the public would do." But the body camera footage showed that the man working on the truck did not come into contact with the officers until well after the initial interaction with McPeek. He was not seen on the initial approach, and when the officers did make contact with him, it was beyond the paved driveway which ran from the street through the front and side yards before ending past the back edge of the house. The man's location was also obscured by the truck he was working on and the car in front of it. Thus, a member of the general public would not have been permitted to go where contact was made with the man or McPeek and would not have even known they were there, as their positions were completely obscured from view by the public. The officers did not have a license to enter the curtilage to interact with McPeek.

Plain View

{¶ 29} Finally, the State argues that the evidence found was within plain view.

Under the plain view doctrine, a warrantless seizure of evidence is permissible where "(1) the officers are lawfully positioned in a place from which the object can be plainly viewed, (2) the incriminating character of the object is immediately apparent, and (3) the officer has a lawful right of access to the object itself." *State v. Goode*, 2d Dist. Montgomery No. 25175, 2013-Ohio-958, ¶ 26, citing *Minnesota v. Dickerson*, 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) and *Horton v. California*, 496 U.S. 128, 136-137, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990). The State's argument does not satisfy the first prong.

**{¶ 30}** Under the first prong, the plain view exception allows law enforcement "to seize clearly incriminating contraband only when it is discovered in a place where the officer[s] [have] a right to be." *State v. Garrett*, 2018-Ohio-4530, 123 N.E.3d 327, ¶ 23 (2d Dist.). In this case, though, we have already concluded that the Riverside officers did not have a right to be behind the house. The arrest warrant was not an adequate justification, because although the officers believed the wanted men lived at the home, they did not know if they were there at the time. Moreover, they did not lawfully enter the curtilage because they went where a "reasonably respectful citizen" would not be permitted to go.

**{¶ 31}** Putting aside the standing issue which the State has waived, we find that the trial court erred by overruling McPeek's motion to suppress. The assignment of error is sustained.

### III.　　Conclusion

**{¶ 32}** The judgment of the trial court will be reversed, and the matter will be remanded to the trial court for further proceedings consistent with this Opinion.

. . . . . . . . . . . . .

TUCKER, J. and LEWIS, J., concur.